IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>vs.<br><br>TRISTEN JAY PETERS,<br><br>              Defendant. | CR 23-48-BLG-SPW<br><br><br>ORDER |

Before the Court is Defendant Tristen Jay Peters's Motion to Suppress.

(Doc. 28).  Defendant asks the Court to suppress (1) statements made by Defendant

at the Montana Probation & Parole Office on January 25, 2023, to drug task force

agents, and (2) evidence from Defendant's phone and its evidentiary fruits.  (*Id.* at

1-2).  Defendant argues that suppression of his statements is necessary because the

officers did not give him a *Miranda* warning, and suppression of the evidence from

the phone and its evidentiary fruits is necessary because the agents did not have

probable cause to seize it.  (Doc. 29).

Defendant requested a hearing.  An evidentiary hearing was held on August

30, 2023.  (Doc. 39).  United States Postal Service TFO Jon Matthew Poe testified.

The Court finds the material facts are not disputed based on Poe's testimony, Poe's

police report (Doc. 30 at 2-11), Parole Officer Jason Ruff's offender activity notes

(*id.* at 12), statements from two U.S. Postal Service employees (Doc. 32-1), the search warrant (Doc. 32-3), and the parties' briefing.

For the following reasons, the Court denies Defendant's motion.

## I. Factual Background

On January 20, 2023, a man who identified himself as Tracey Peters went into the Main Post Office at 841 S. 26th Street in Billings and asked about an express package he said was a present for his grandmother that he needed for early the next morning. (Doc. 32-1 at 2). One Postal Service employee who spoke with the man said he was "already upset that the carrier didn't leave it" at his house. (*Id.* at 3). Another clerk recounted that "there was something odd about his demeanor. He would not stand still. [He] kept looking over his shoulder, his eyes were bloodshot, and he was very figity [sic]." (*Id.* at 2). The employees told him that the carrier still had the package and that he could come back between 4:30 p.m. and 5:30 p.m. (*Id.* at 3). One of the employees called the Postal Inspector about the "suspicious" situation. (*Id.* at 2).

The man returned around 4:45 p.m., and one of the employees retrieved the package from the back. (*Id.* at 3). While waiting, the man reportedly "kept pacing around the lobby, constantly looking outside." (*Id.*). He said that his friend had given him a ride and "kind of parked in the middle of the lot out there, I'm just

making sure he's not parked weird still." (*Id.*).  The employee at the desk noted she did not see any oddly parked car.

When an employee returned with the package, she asked for the man's identification.  His I.D., which identified him as Tristen Peters, did not match the name on the package, Joe Martinez.  (*Id.*; Doc. 30 at 4).  The employee refused to give him the package because the names did not match.  The man explained he always uses different names so he can protect his identity.  (Doc. 32-1 at 3).  The man left his phone number with the employees and "stormed out."  (*Id.*).

The Postal Inspector noted other suspicious markers about the package that signaled potential drug trafficking.  The package was paid for in cash, had a handwritten label, and was inbound from Arizona, a known source state.  (Doc. 30 at 4).  Based on open-source databases, the Postal Inspector learned the sender was not associated with the return address, and the IP addresses that had tracked the package were traced to Mexico.  (*Id.*).  The Postal Inspector called Poe to investigate further.

Poe arrived at the Post Office later that day and deployed a K9 on the package.  (*Id.*).  The K9 alerted and indicated on the package, which was then secured by Poe.  (*Id.*).  Poe applied for and was granted a search warrant by U.S. Magistrate Judge Timothy Cavan.  (*Id.*).  The package contained a PlayStation video game cartridge wrapped in bubble wrap.  (*Id.*).  The seams of the cartridge

were heavily taped, and inside was a vacuum-sealed bag of 519 fentanyl pills, weighing 56.58 grams. (*Id*.).

On January 24, Poe attempted a controlled pickup of the package. (*Id*. at 5). When Poe called the number left with the Post Office to notify the man the package was ready for pickup, a man believed to be Defendant answered and responded, "Oh, ok." (*Id*.). No one picked up the package. (*Id*.).

Poe testified that he contacted Montana Probation & Parole to see if they had a Tristen Peters registered as a probationer or parolee. The office confirmed Defendant was a parolee and gave Poe his phone number. The number matched the number left with the Postal Service.

Probation and Parole Officer Shane Skillen told Poe that Defendant had asked his parole officer, Officer Jason Ruff, to meet to talk about moving to a different city. (Doc. 30 at 5). On January 25, Defendant met with Ruff in Ruff's office. At some point, Poe and EMHIDA Agent Matt Henderson entered Ruff's office. Poe testified that Ruff left and closed the door. According to Poe, Poe was either sitting on or standing next to one desk, and Henderson was sitting at an adjacent desk. Defendant sat in a chair across from them with the door to his right. No one was between Defendant and the door, and Poe and Henderson remained at the desks for the entire meeting.

4

Poe identified himself and Henderson as law enforcement, then explained to Defendant that Poe was notified about the package and the circumstances behind it, discovered fentanyl in the package, and believed Defendant was the person who had tried to retrieve it. Defendant denied any knowledge of the package. (Doc. 30 at 9). Poe then put the package in front of Defendant, and, as Poe described, Defendant became "visibly nervous." (*Id.*). Defendant asked if he "was going to fed or state," which Poe interpreted as meaning which prison system. (*Id.*). Defendant then explained he had gone to the Post Office looking for a package, received a phone call to come get the package, but never retrieved it. (*Id.*). Poe and Henderson reiterated to Defendant that they knew he had come to the Post Office looking for the package and left his name and phone number with the postal employees. (*Id.*). Defendant asked if he was going to jail today, then said he would not talk with federal agents. (*Id.*). Poe, Henderson, and Ruff took Defendant's house keys and searched Defendant's house. (*Id.*). They did not see or seize anything of evidentiary value. (*Id.*). Poe testified that he ended the meeting by stating that they were going to continue investigating. Defendant was not arrested. According to Poe, the interaction lasted less than five minutes.

Also before leaving, Poe seized Defendant's phone and applied for a warrant to search it. Thirteenth Judicial District Judge Jessica Fehr granted the application.

(Doc. 32-3). Upon searching the phone, law enforcement found photos of the tracking number associated with the package. (Doc. 30 at 9).

Defendant was charged in this Court on April 20, 2023, with attempted possession with intent to distribute 40 grams or more fentanyl in violation of 21 U.S.C. §§ 841(a)(1), 846. (Doc. 1). He filed the instant suppression motion on July 26, 2023.

## II.    Discussion

### A.    *Suppression of Defendant's Statements*

The Fifth Amendment provides that "[n]o person … shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "In *Miranda v. Arizona*, the Supreme Court adopted prophylactic procedural measures to guarantee that a suspect is advised of his Fifth Amendment rights before custodial interrogations." *United States v. Craighead*, 539 F.3d 1073, 1082 (9th Cir. 2008) (citing *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966)). These measures, known as *Miranda* rights, are constitutional in nature. *Dickerson v. United States*, 530 U.S. 428, 435 (2000). Thus, failure to advise a suspect of their *Miranda* rights before a custodial interrogation violates the Fifth Amendment and justifies suppression of any statements a defendant made during the interrogation. *Id*.

Whether law enforcement needs to advise a suspect of their *Miranda* rights

depends on two questions: Whether the defendant was (1) in custody, and (2)

subject to an interrogation. *Miranda*, 384 U.S. at 444. The parties disagree on

both elements. The Court will address each in turn.

   *1.      Custody*

In cases where a suspect has not formally been taken into police custody, the

suspect still is considered "in custody" for purposes of *Miranda* if the suspect has

been "deprived of his freedom of action in any significant way." *Id.* To determine

if such a deprivation occurred, the Court must decide whether, based on the totality

of the circumstances, a reasonable person in those circumstances would have

believed they could freely walk away from the interrogators. *United States v. Kim*,

292 F.3d 969, 973-74 (9th Cir. 2002); *Craighead*, 539 F.3d at 1082. The Court

considers the following factors: "(1) the language used to summon the individual;

(2) the extent to which the defendant is confronted with evidence of guilt; (3) the

physical surroundings of the interrogation; (4) the duration of the detention; and

(5) the degree of pressure applied to detain the individual." *Kim*, 292 F.3d at 974

(internal quotation marks and citations omitted).

Considering the Ninth Circuit's factors, Defendant was not "in custody" for

the purposes of *Miranda*. First, the language "used to summon" Defendant was

not indicative of custody. Defendant was not commanded to come to the parole

7

office; rather, he arranged to come there and arrived on his own volition. *See United States v. Nieblas*, 115 F.3d 703, 705 (9th Cir. 1997) (finding against custody because the defendant arranged the meeting at the probation office by appointment and voluntarily appeared for the interview). *Cf. United States v. Barnes*, 713 F.3d 1200, 1204 (9th Cir. 2013) (the defendant was commanded to appear for a meeting by his parole officer under the threat of revocation). Though Poe and Henderson effectively ambushed Defendant in Ruff's office, Poe and Henderson identified themselves as law enforcement and never told Defendant he was under arrest or not free to leave. *See United States v. Paiz*, CR 06-710, 2007 WL 1052891, at *3 (N.D. Cal. Apr. 5, 2007) (finding that the questioning of a defendant at the probation office was not custodial when the defendant voluntarily arrived, even though he did not know he was going to talk with FBI agents). This factor weighs against a finding of custody.

As to the second factor—whether Defendant was confronted with evidence of guilt—the Court finds this factor does not weigh in Defendant's favor. The Ninth Circuit has found a defendant is in custody "when the interrogator adopts an aggressive, coercive, and deceptive tone." *United States v. Bassignani*, 575 F.3d 879, 884 (9th Cir. 2009). In contrast, a defendant is not in custody when the officers do "'not attempt to challenge [the defendant's] statements with other

8

'known facts' suggesting his guilt, they merely ask[] [them] about the allegations.'" *Id.* (*United States v. Norris*, 428 F.3d 907, 913 (9th Cir. 2005)).

Here, law enforcement merely presented to Defendant the allegations, as in *Norris*. Further, nothing in the record indicates that the officers employed aggression, coercion, or deception. Based on Poe's testimony, they had a relatively casual tone and body language. In contrast, in *United States v. Wauneka*, four or five officers had an opportunity to question Wauneka for more than an hour each, saying that Wauneka had "supplied information only a perpetrator would know, that he matched the description of the rapist, and that he better tell the truth." 770 F.2d 1434, 1438-39 (9th Cir. 1985). Wauneka was crying and shaking during a break in the interrogation, *id.* at 1439, while Defendant here was only "visibly nervous." In fact, Defendant stood his ground in not talking to the agents any further after less than a couple of minutes. Given the applicable legal standard, Defendant's assertion that the "blunt" presentation of evidence against Defendant is inherently coercive is overstated. (Doc. 29 at 11).

Third, the impact of the physical surroundings of the encounter is neutral. On the one hand, Defendant was in a familiar location—his parole officer's office. *Bassignani*, 575 F.3d at 885. *See also Minnesota v. Murphy*, 465 U.S. 420, 433 (1984) (the defendant's regular meetings at the probation office "should have served to familiarize him with his surroundings and to insulate him from

psychological intimidation that might overbear his desire to claim the privileges of *Miranda*."). On the other hand, Poe and Henderson took complete control of the office, and the one person familiar to Defendant—his parole officer, Ruff—left. *See Kim*, 292 F.3d at 977. Still, neither officer was situated between him and the door such that he could leave without being physically obstructed. *See Paiz*, 2007 WL 1052891, at *3 (finding that an agent being situated between the defendant and the door can indicate custody).

Fourth, the duration of the encounter weighs against a finding of custody because it lasted, according to Poe, less than five minutes. *See Kim*, 292 F.3d at 977 (finding an interrogation lasting approximately one hour to be suggestive of custodial circumstances).

Finally, the degree of pressure applied to detain Defendant weighs against a finding of custody. Though Defendant was in a confined space with the officers after Ruff left and was mandated by his parole terms to be there, he was not handcuffed, arrested, or physically intimated. *See Barnes*, 713 F.3d at 1204; *United States v. Edrington*, 851 F. App'x 574, 577 (6th Cir. 2021) (officers made no effort to restrain the defendant, such as by displaying weapons or handcuffs or blocking access to the door in the probation office).[1]

---

[1] *Barnes* found this factor to be neutral and that the defendant was in custody when law enforcement questioned him. However, the Court placed substantial weight in its assessment of custody and to the degree of pressure applied on the fact that the defendant was commanded by his parole officer to come to the meeting under the threat of revocation. *See* 713 F.3d at 1204. Since Defendant here arrived

Considering the factors together, no one factor weighs so strongly in favor of a finding of custody when considering the totality of the circumstances so as to outweigh the other factors indicating Defendant was not in custody. Thus, the Court finds Defendant was not in custody for the purposes of the Fifth Amendment and law enforcement was not required to read him his *Miranda* rights.

### 2.     *Interrogation*

Even assuming Defendant was in custody, he was not subject to an interrogation. "The test to determine whether questioning is interrogation within the meaning of *Miranda* is whether under all of the circumstances involved in a given case, the questions are reasonably likely to elicit an incriminating response from the suspect." *United States v. Salgado*, 292 F.3d 1169, 1172 (9th Cir. 2002) (internal citations and quotation marks omitted). *Miranda* is not limited to "express questioning" or to statements "punctuated with a question mark." *Rhode Island v. Innis*, 446 U.S. 291, 301 & n.6 (1980). Rather "'the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent.'" *Martinez v. Cate*, 903 F.3d 982, 993 (9th Cir. 2018) (quoting *Innis*, 446 U.S. at 300-01).

---

voluntarily and no threat to his parole status was made, *Barnes*'s conclusions as to the weight of the fifth factor and the ultimate custody determination are distinct.

"The functional equivalent of interrogation is defined as 'any words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *Id.* (quoting *Innis*, 446 U.S. at 301). This definition "focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Innis*, 446 U.S. at 301. However, it also is an objective standard, such that the police "cannot be held accountable for the unforeseeable results of their words or actions[.]" *Id.*

"Subjecting a suspect to 'subtle compulsion,' without more, is not the functional equivalent of interrogation." *United States v. Morgan*, 738 F.3d 1002, 1006 (9th Cir. 2013) (quoting *Innis*, 446 U.S. at 303). For instance, in *United States v. Moreno-Flores*, the Ninth Circuit found that an agent explaining to the defendant that the agent had seized about 600 pounds of cocaine and that the suspect was in trouble was not the functional equivalent of an interrogation because the statements did not invite a response from the suspect. 33 F.3d 1164, 1168-70 (9th Cir. 1994). Similarly, in *Shedelbower v. Estelle*, the Ninth Circuit held that an officer telling the defendant that his accomplice was in custody and that the victim identified defendant as one of her perpetrators was not the functional equivalent of interrogation because they were not the type of comments to elicit an incriminating remark. 885 F.2d 570, 573 (9th Cir. 1989).

The Court finds that law enforcement only subjected Defendant to subtle compulsion and not an interrogation. As the parties stipulate, neither Poe nor Henderson asked Defendant any questions. Therefore, the Court asks whether their conduct was the functional equivalent of an interrogation. Like *Moreno-Flores* and *Shedelbower*, Poe and Henderson merely presented the evidence they had against Defendant and gave him the space to respond. The fact they "may have struck a responsive chord" with Defendant and prompted his admissions concerning the package does not raise their actions to the level of an interrogation. *Moreno-Flores*, 33 F.3d at 1170.

The lack of additional pressure to make incriminating statements or admit guilt supports the Court's conclusion. Law enforcement never tried to convince Defendant that he was guilty over his denials or protestations. *Cf. United States v. Bentley*, 30 F.3d 140, 1994 WL 408236, at *4 (9th Cir. Aug. 4, 1994) ("When the police try to convince a defendant, over her protestations, that she is guilty, they should know that their remarks are likely to elicit an incriminating response—either a confession or a further, possibly damaging, insistence on innocence."). Their statements were not even as accusatory as those found to be non-interrogative in *United States v. Crisco*, where officers, in response the defendant saying he did not understand the charges against him, reminded defendant, "Hey,

you met with me—for the purpose of seeing $60,000 that I was going to use to buy a kilo of cocaine." 725 F.2d 1228 (9th Cir. 1984).

For these reasons, the Court finds that Poe and Henderson did not subject Defendant to an interrogation, were not required to read Defendant his *Miranda* rights, and did not violate the Fifth Amendment.

B.    *Suppression of Evidence Procured from the Seizure and Search of Defendant's Phone*

The parties disagree on whether Poe's seizure of Defendant's phone violated the Fourth Amendment.  Defendant argues the seizure violated the Fourth Amendment because Poe did not have a search warrant or justify the warrantless seizure in his report, and Defendant's parole officer did not authorize the seizure, as required by Defendant's conditions of parole.  (Doc. 29 at 16).  The Government argues that Poe was justified because reasonable suspicion existed that Defendant violated a condition of his parole, namely the commission of another offense, and because the warrant to search the phone was supported by probable cause.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]"  U.S. Const. amend. IV.  "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in the property." *United States v. Jacobson*, 466 U.S. 109, 113 (1984).

14

Generally, seizures of personal property are per se unreasonable without a warrant. *Illinois v. McArthur*, 531 U.S. 326, 330 (2001). However, the Supreme Court has found that "certain general, or individual, circumstances may render a warrantless seizure reasonable." *Id.* (collecting cases). "Determining the reasonableness of a particular [seizure] involves balancing 'on the one hand, the degree to which [the seizure] intrudes upon an individual's privacy, and on the other, the degree to which [the seizure] is needed for the promotion of legitimate governmental interests.'" *United States v. Johnson*, 875 F.3d 1265, 1273 (9th Cir. 2017) (quoting *United States v. Lara*, 815 F.3d 605, 610 (9th Cir. 2016) (quoting *United States v. Knights*, 534 U.S. 112 (2001))).

The Ninth Circuit has "repeatedly recognized that status as a parolee significantly diminishes one's privacy interests as compared to the average citizen." *Id.* (citing *Samson v. California*, 547 U.S. 843, 850 (2006)). "'[P]arole is an established variation on imprisonment of convicted criminals' and granted only 'on the condition that the prisoner abide by certain rules during the balance of the sentence.'" *Id.* (quoting *Samson*, 574 U.S. at 850). "Parolees are thus subject to various state-imposed intrusions on their privacy, including mandatory drug tests, meetings with parole officers, and travel restrictions." *Id.* at 1274 (citing *Samson*, 547 U.S. at 851). Importantly, though, "'restrictions on a parolee's liberty are not

15

unqualified,'" and "parolees still enjoy limited Fourth Amendment rights." *Id.* (quoting *Samson*, 547 U.S. at 850 n.2).

A person's privacy interests in their cell phone are "particularly acute" under the Fourth Amendment because they "store vast quantities of sensitive data, and because cell phones have become ubiquitous[.]" *Id.* (citing *Riley v. California*, 573 U.S. 373, 2489-91 (2014)). "Unlike other types of searches, the search of a person's cell phone can 'typically expose ... far *more* than the most exhaustive search of a house,' as modern cell phones contain '[t]he sum of an individual's private life.'" *Id.* (quoting *Riley*, 573 U.S. at 2489, 2491) (emphasis in original).

Despite this acute privacy interest, *Johnson* still permitted the warrantless search of a parolee's cell phone because of the "substantial" government interest in supervising parolees that would be undermined by requiring officers to obtain a search warrant. *Id.* at 1275-76. "Those interests include combating recidivism, promoting reintegration, and effectively detecting parole violations." *Id.* at 1275. *Johnson* further cited to a condition of Johnson's parole that allowed him to be searched by any member of law enforcement "at any time of the day or night, with or without a search warrant or with or without cause[,]" California Penal Code § 3067, as well as the fact that his phone was being searched pursuant to suspicion that he committed a crime, not a mere parole violation. *Id.* at 1275.

16

As an initial matter, the Court agrees with Defendant that the condition of his parole permitting searches of Defendant with reasonable suspicion did not authorize Poe's seizure of Defendant's phone. The condition requires the parole officer, not any member of law enforcement, to ascertain that reasonable suspicion exists. (Doc. 32-2 at 6). Nothing in the record indicates that Ruff determined that reasonable suspicion existed. The condition also applies to searches of persons or property, not seizures of property, unless such property is illegal or contraband. (*Id.*). A phone is neither, so the condition is entirely inapplicable.

Accordingly, the Court must decide whether Poe was permitted to seize Defendant's phone under the Fourth Amendment. The Court finds that the brief seizure of Defendant's phone pending the search warrant was constitutional based on *Johnson*. Defendant's status as a parolee automatically diminishes his Fourth Amendment privacy rights in his phone and elevates law enforcement's concerns. Furthermore, the intrusion on his privacy interest was substantially less than that in *Johnson* because Poe did not search his phone—and thus access the data it contained—before securing the warrant; Poe only seized it. Thus, the only intrusion on Defendant's privacy rights was to the possession of his phone, not the contents of it. Last, like in *Johnson*, law enforcement was investigating whether Defendant committed a serious drug crime, not a mere violation of his parole.

The Court recognizes that the type of parole condition in *Johnson* that authorized the search by a member of law enforcement other than Johnson's parole officer does not exist here.  However, given the weight of the government's interests against Defendant's minimal privacy interests and the fact that Poe only seized Defendant's phone, the Court is not swayed by the absence of an analogous parole condition here.

Accordingly, the seizure of Defendant's phone did not violate his Fourth Amendment rights.

### III.  Conclusion

For these reasons, law enforcement was not required to read Defendant his *Miranda* rights during the January 25, 2023, meeting and properly seized his phone pending the search warrant.  His constitutional rights were not violated, and suppression is not warranted.

IT IS SO ORDERED that Defendant Tristen Jay Peters's Motion to Suppress (Doc. 28) is DENIED.

DATED this 18th day of September, 2023.

SUSAN P. WATTERS
United States District Judge